**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

---

Ruth Lindsey and Fred Lindsey,

      Plaintiffs,

vs.

EQUIFAX INFORMATION SERVICES
LLC, EXPERIAN INFORMATION
SOLUTIONS, Inc., TRANS UNION
LLC, and ADVIA CREDIT UNION,

      Defendants.

Civil Action No.  2:26-cv-11022

With Jury Demand Endorsed

---

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiffs, Ruth Lindsey and Fred Lindsey ("Plaintiffs"), by and through counsel, for Plaintiffs' Complaint against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and Advia Credit Union, jointly, severally, and in solido, state as follows:

### I.  INTRODUCTION

1.     Three of the Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC are consumer reporting agencies ("CRAs") as defined by 15 U.S.C. § 1681a(f), and the other Defendant, Advia Credit Union, is a furnisher of consumer information. All Defendants have violated 15 U.S.C. § 1681 *et seq.*, known as the Fair Credit Reporting Act (the "FCRA"). Plaintiffs seek to recover from Defendants actual, statutory, and punitive damages, injunctive relief, legal fees, and expenses.

## II. PARTIES

2.      Plaintiffs are natural persons residing in Southfield, Michigan is a "consumer," as defined by the FCRA, 15 U.S.C. § 1681a(c), and is a victim of repeated false credit reporting.

**Made Defendants herein are**:

3.      Upon information and belief, Defendant Equifax Information Services LLC, which may also hereinafter be referred to as "Equifax," "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is a Georgia limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its headquarters, 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309.  Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation.

4.      Upon information and belief, Experian Information Solutions, Inc., which may also hereinafter be referred to as "Experian", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants,"', does business in this judicial district and is an Ohio corporation with its principal place of business in California. Experian is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Experian regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Experian disburses such consumer reports to third parties of contract for monetary compensation.

5.      Upon information and belief, Defendant Trans Union LLC, which may also

hereinafter be referred to as "Trans Union", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is an Illinois limited liability company that does business in this judicial district and may be served by delivering a summons to its headquarters, 555 West Adams Street, Chicago, Illinois 60681. Trans Union is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Trans Union regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation.

6.      Upon information and belief, Defendant Advia Credit Union, which may also hereinafter be referred to as "Advia," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is a Michigan corporation that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, 6400 W Main St, Kalamazoo, MI 49009. Advia is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

7.      As used herein, "consumer reporting agency," or "CRA," means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports (commonly referred to as "credit reports") to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports and is an entity in the business of collecting, maintaining and disseminating information regarding the credit-worthiness of individuals. CRAs specifically include, but are not limited to, Equifax, Experian, and Trans Union.

### III.  JURISDICTION AND VENUE

8.      Plaintiffs respectfully assert that this Honorable Court has jurisdiction in this case arising under federal law. 28 U.S.C. § 1331, 1334, and 1367 and 15 U.S.C. § 1681(p). Plaintiffs also assert actions under states' laws which may be brought within the supplemental jurisdiction of this Court and Plaintiffs respectfully request that this Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. § 1367.

9.      Venue is proper in this District, because Plaintiffs reside in this judicial district, the credit reporting at issue is associated to account numbers assigned to either property or the consumer(s) who are located in this judicial district. CRA Defendant and Furnisher Defendant transact business in this District, and a substantial part of the conduct complained of occurred in this district, and various actions made basis of Plaintiffs' claims against Defendants occurred in the Eastern District of Michigan as further described. 28 U.S.C. § 1391.

10.     Venue is proper in this District, because the CRA Defendants and Furnisher Defendants transact business in this District. Furnisher Defendant's headquarters is located in this judicial district, a substantial part of the conduct complained of occurred in this district, and various actions made basis of Plaintiffs' claims against Defendants occurred in the Eastern District of Michigan as further described. 28 U.S.C. § 1391.

11.     Venue is further proper in this District, because the CRA Defendants entered into agreements with Furnisher Defendant in this judicial district to receive credit reporting data concerning Plaintiffs. Any and all requests to investigate Plaintiffs' disputes sent from the CRA Defendants as part of Defendants' reinvestigations was submitted to Furnisher Defendant's headquarters and investigated by Furnisher Defendant using its resources located at or closely

connected to this judicial district. Furnisher Defendant managed Plaintiffs' account(s) from this judicial district including communicating amounts owed and conducting numerous communications via phone and letter.

## IV.  FACTUAL ALLEGATIONS

12.     In or around May 2017, Plaintiffs secured an auto loan with Advia Credit Union and assigned account number 406200*** (hereinafter the "Advia loan" or "Advia account" or "Advia tradeline").

13.     In or around July 2019, Plaintiff Ruth Lindsey secured an auto loan with Rocket Loans and assigned account number 158721*** (hereinafter the "Rocket loan" or "Rocket account" or "Rocket tradeline").

14.     On or around October 23, 2019, Plaintiffs filed for bankruptcy protection under Chapter 13 of Title 11.

15.     A redacted copy of Plaintiffs' chapter 13 bankruptcy docket report for Plaintiffs' bankruptcy case is attached hereto as Exhibit "A".

16.     On March 18, 2025, the Plaintiffs were discharged from Chapter 13 Bankruptcy and excepted from discharge the mortgage loan—the Advia loan.

17.     A redacted copy of Plaintiff's chapter 13 Discharge Order is attached hereto as Exhibit "B".

18.     Read in concert, Sections 1322(a)(2), 1322(b)(5), and 1328(a)(1) of the Bankruptcy Code, bar discharging home mortgage debts and certain other secured debts in a chapter 13 bankruptcy.

19.     Throughout Plaintiffs' chapter 13 bankruptcy, under direct or indirect order from

the bankruptcy, timely monthly payments were made to the Rocket Mortgage and Advia accounts.

20. Sometime in October 2025, Plaintiffs obtained Plaintiffs' three-bureau credit reports and noticed that the Equifax, Experian, and Trans Union credit report(s) were not accurate.

21. Redacted copies of Plaintiffs' October 2025 tri-merge credit reports are attached hereto as Exhibit "C".

22. Within the Tri-Merge credit report, Plaintiff Ruth Lindsey noticed that Equifax reported the following inaccuracies for Plaintiff's Rocket mortgage: Equifax failed to update the reporting of the Rocket mortgage after Plaintiff's chapter 13 bankruptcy was discharged; reported an account status of "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, still residing in the home, and making payments on the property before, during, and after Plaintiff's chapter 13 bankruptcy.

23. This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's chapter 13 bankruptcy, was successfully discharged, and excepted Plaintiff's residential home mortgage debt from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Rocket mortgage tradeline after the chapter 13 bankruptcy was discharged.[1]

24. Within the Tri-Merge credit report, Plaintiff Ruth Lindsey noticed that Equifax reported the following inaccuracies for her Advia account: Equifax failed to update the reporting

---

[1] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

of the Advia account after Plaintiff's chapter 13 bankruptcy was discharged; reported an account status of "derogatory"; and reported within the creditor remarks section references to Plaintiffs' chapter 13 bankruptcy, despite the Plaintiffs having been discharged from chapter 13 bankruptcy.

25.     Within the Tri-Merge credit report, Plaintiff Fred Lindsey noticed that Equifax reported the following inaccuracies for her Advia account: Equifax failed to update the reporting of the Advia account after Plaintiff's chapter 13 bankruptcy was discharged; reported the closed account as open and owing a $294 payment amount despite the account being closed and transferred and Plaintiff having been discharged from chapter 13 bankruptcy.

26.     This reporting is incorrect because Plaintiffs completed the required payments through Plaintiffs' chapter 13 bankruptcy, was successfully discharged, and excepted Plaintiffs' secured auto debt from being discharged; therefore, any remarks and/or references and or suppression codes related to a chapter 13 bankruptcy should have been removed from the Advia account tradeline after the chapter 13 bankruptcy was discharged.[2]

27.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically instruct furnishers and/or consumer reporting agencies to remove any referencing to a chapter 13 bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In

---

[2] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 bankruptcy, and then continued reporting once a consumer is discharged.

28.     Metro 2 guidelines have been adopted by Equifax as the industry standards, and these industry standards are followed by both furnishers and Equifax.

29.     Within the Tri-Merge credit report, Plaintiff Ruth Lindsey noticed that Experian reported the following inaccuracies for Plaintiff's Rocket mortgage: Experian failed to update the reporting of the Rocket mortgage after Plaintiff's chapter 13 bankruptcy was discharged; reported an account status of "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, still residing in the home, and making payments on the property before, during, and after Plaintiff's chapter 13 bankruptcy.

30.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's chapter 13 bankruptcy, was successfully discharged, and excepted Plaintiff's residential home mortgage debt from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Rocket mortgage tradeline after the chapter 13 bankruptcy was discharged.[3]

31.     Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the following inaccuracies for Plaintiffs' Advia account: Equifax failed to update the reporting of the Advia account after Plaintiffs' chapter 13 bankruptcy was discharged; reported an account status

---

[3] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

of "derogatory"; and reported within the creditor remarks section references to Plaintiffs' chapter 13 bankruptcy, despite the Plaintiffs having been discharged from chapter 13 bankruptcy, and making payments to the secured auto debt during Plaintiffs' chapter 13 bankruptcy.

32.     This reporting is incorrect because Plaintiffs completed the required payments through Plaintiffs' chapter 13 bankruptcy, was successfully discharged, and excepted Plaintiffs' secured auto debt from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Advia account tradeline after the chapter 13 bankruptcy was discharged.[4]

33.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically instruct furnishers and/or consumer reporting agencies to remove any referencing to a chapter 13 bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 bankruptcy, and then continued reporting once a consumer is discharged.

34.     Metro 2 guidelines have been adopted by Experian as the industry standards, and these industry standards are followed by both furnishers and Experian.

---

[4] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

35.     Within the Tri-Merge credit report, Plaintiff Ruth Lindsey noticed that Trans Union reported the following inaccuracies for Plaintiff's Rocket mortgage: Trans Union failed to update the reporting of the Rocket mortgage after Plaintiff's chapter 13 bankruptcy was discharged; reported an account status of "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, still residing in the home, and making payments on the property before, during, and after Plaintiff's chapter 13 bankruptcy.

36.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's chapter 13 bankruptcy, was successfully discharged, and excepted Plaintiff's residential home mortgage debt from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Rocket mortgage tradeline after the chapter 13 bankruptcy was discharged.[5]

37.     Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs' Advia account: Trans Union failed to update the reporting of the Advia account after Plaintiffs' chapter 13 bankruptcy was discharged; reported an account status of "derogatory"; and reported within the creditor remarks section references to Plaintiffs' chapter 13 bankruptcy, despite the Plaintiffs having been discharged from chapter 13 bankruptcy, and making payments to the secured auto debt during Plaintiffs' chapter 13 bankruptcy.

38.     This reporting is incorrect because Plaintiffs completed the required payments

---

[5] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

through Plaintiffs' chapter 13 bankruptcy, was successfully discharged, and excepted Plaintiffs' secured auto debt from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Advia account tradeline after the chapter 13 bankruptcy was discharged.[6]

39. Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically instruct furnishers and/or consumer reporting agencies to remove any referencing to a chapter 13 bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 bankruptcy, and then continued reporting once a consumer is discharged.

40. Metro 2 guidelines have been adopted by Trans Union as the industry standards, and these industry standards are followed by both furnishers and Trans Union.

41. On or about November 5, 2025, Plaintiffs sent direct disputes to the CRA Defendant(s) and requested that the CRAs investigate the reporting of the Advia and Rocket account(s), and Plaintiffs specifically addressed the above referenced issues with the reporting stated in the above Paragraphs. Plaintiffs requested that under the FCRA, the CRAs conduct

---

[6] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

reasonable investigations and/or remedy the inaccuracies on Plaintiffs' credit reports concerning the Advia and Rocket account(s).

42.    Redacted copies of Plaintiffs' unsigned dispute letters sent to CRAs are attached hereto as Exhibits "D", "E", and "F" respectively.

43.    Equifax responded to Plaintiff Ruth's dispute on November 30, 2025. Equifax responded to Plaintiff Fred's dispute on November 25, 2025.

44.    Redacted  copies of Equifax's responses are attached hereto as Exhibit "G".

45.    Plaintiffs also requested an updated consumer report to see if any changes were made on Plaintiff's Consumer Report.

46.    Redacted copies of Plaintiff's updated tri-merge credit report is as Exhibit "H".

47.    Concerning Plaintiff Fred Lindsey, Equifax's response and the updated tri-merge credit report showed that Equifax made the correction for the Advia account and reported transferred, closed, and without the negative bankruptcy remarks and indicators.

48.    Concerning Plaintiff Ruth Lindsey, Equifax's response and the updated tri-merge credit report showed that Equifax made none of the substantive changes Plaintiff requested in the direct dispute to Equifax, failed to update the Advia and Rocket accounts after the chapter 13 bankruptcy was discharged, and continued to report references to the chapter 13 bankruptcy on Plaintiff's Advia and Rocket account(s) even though the Advia account was fixed on Plaintiff Fred Lindsey's account.

49.    Equifax's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the Advia and Rocket account(s) and gave no explanation as to why the Advia and Rocket account(s) were still reporting inaccurately. Further, Equifax fixed the same disputed issues for Plaintiff Fred Lindsey's Advia

account.

50. Plaintiff's inaccurate Equifax consumer reports were disseminated to third parties before and/or after the instant dispute.

51. Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiff's Advia and Rocket account(s).

52. Upon the Plaintiff's request to Equifax for verification and correction regarding the Advia and Rocket account(s), and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiff Ruth Lindsey's information, claims or evidence, and did not make any attempt to verify the reporting of the Advia and Rocket account(s) substantially or reasonably.

53. Equifax has adopted the Metro 2 reporting standard, Equifax deviated from the standard based on its conduct in this case, and by Equifax deviating from the adopted standard, Equifax injured Plaintiff's credit standing.

54. In the alternative, Equifax failed to contact Furnisher Defendant, therefore, failed to perform any investigation at all.

55. In the alternative to the allegation that Equifax failed to contact Furnisher Defendant, it is alleged that Equifax did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

56. Experian responded to Plaintiff Fred's dispute on November 19, 2025. Experian responded to Plaintiff Ruth's dispute on December 1, 2025.

57. Redacted copies of Experian's responses are attached hereto as Exhibit "I".

58. Plaintiffs requested an updated consumer report to see if any changes were made

on Plaintiff's Consumer Report. *See* Exhibit "H".

59. Experian's responses and the updated tri-merge credit reports showed that Experian made none of the substantive changes Plaintiffs requested in the direct dispute to Experian, failed to update the Advia and Rocket account(s) after the chapter 13 bankruptcy was discharged, and continued to report references to the chapter 13 bankruptcy on Plaintiffs' Advia and Plaintiff Ruth Lindsey's Rocket account(s).

60. Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Advia and Rocket account(s) and gave no explanation as to why the Advia and Rocket account(s) was/were still reporting inaccurately. Further, Equifax fixed the same disputed issues for Plaintiff Fred Lindsey's Advia account.

61. Plaintiffs' inaccurate Experian consumer reports were disseminated to third parties before and/or after the instant dispute.

62. Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' respectiveaccount(s).

63. Upon the Plaintiffs' requests to Experian for verification and correction regarding the Advia and Rocket account(s), and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Advia and Rocket account(s) substantially or reasonably.

64. Experian has adopted the Metro 2 reporting standard, Experian deviated from the standard based on its conduct in this case, and by Experian deviating from the adopted standard,

Experian injured Plaintiffs' credit standing.

65. In the alternative, Experian failed to contact Furnisher Defendant, therefore, failed to perform any investigation at all.

66. In the alternative to the allegation that Experian failed to contact Furnisher Defendant, it is alleged that Experian did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

67. Trans Union responded to Plaintiff Fred's dispute on November 27, 2025. Trans Union responded to Plaintiff Ruth's dispute on December 2, 2025.

68. Redacted copies of Trans Union's responses are attached hereto as Exhibit "J".

69. Plaintiffs requested an updated consumer report to see if any changes were made on Plaintiff's Consumer Report. *See* Exhibit "H".

70. Trans Union's responses showed that Trans Union made none of the substantive changes Plaintiff requested in the direct dispute to Trans Union, failed to update the Advia and Rocket account(s) after the chapter 13 bankruptcy was discharged, and continued to report references to the chapter 13 bankruptcy on Plaintiff Ruth Lindsey's Rocket account(s) and deleted the Advia account(s) without explanation or reasons for an outright deletion.

71. In the alternative and/or in contrast to Trans Union's response, Plaintiff Fred Lindsey's updated consumer report showed that Trans Union still reported the Advia account with the same negative bankruptcy information.

72. Trans Union's response, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes, and Trans Union failed to remedy the inaccuracies within the Advia account(s) while continuing to report chapter 13 bankruptcy remarks on Plaintiff Ruth Lindsey's Rocket account.

73. Trans Union's response gave no explanation as to why it failed to sufficiently update and/or modify the Advia account(s) when Plaintiffs demonstrated they were secured debts and they were successfully discharged from bankruptcy.

74. Upon the Plaintiffs' request to Trans Union to verify and correct the Advia account(s), and in accordance with Trans Union's standard procedures, as well as the FCRA, because Trans Union ignored the evidence Plaintiffs included with Plaintiffs' dispute letters and unilaterally deleted the Advia account(s) from Plaintiffs' Trans Union Consumer Reports.

75. Trans Union failed to follow a similar procedure that allowed for Equifax to make the corrections for Plaintiff Fred Lindsey.

76. Trans Union seemingly saw the word "Bankruptcy" in Plaintiffs' dispute letters and unilaterally decided to delete the Advia account(s) and not even attempt to contact the furnisher of credit information.

77. Trans Union simply ignored Plaintiffs' requests to involve Plaintiffs' lender, did not evaluate or consider whether these were secured accounts, whether Plaintiffs earned a discharge and lazily deleted the account(s) without any explanation.

78. Trans Union's willful failure to involve Advia in Plaintiffs' FCRA dispute is a willful violation of the Fair Credit Reporting Act (FCRA) under § 1681i(a)(2). The FCRA required Trans Union to promptly notify Advia of the dispute and provide all relevant information it received from Plaintiffs for Advia to investigate.

79. Trans Union willfully decided to keep Plaintiffs' disputes to themselves and deleted the Advia without perform any investigation at all.

80. Trans Union's failure to investigate Plaintiffs' dispute letters, its failure to include Advia in the dispute process, and its willful actions have injured Plaintiffs' credit standing.

81. Trans Union has adopted the Metro 2 reporting standard, Trans Union deviated from the standard based on its conduct in this case, and by Trans Union deviating from the adopted standard, Trans Union injured Plaintiffs' credit standing.

82. In the alternative to the allegation that Trans Union failed to contact Furnisher Defendant, it is alleged that Trans Union did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

## V.  GROUNDS FOR RELIEF

### EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

83. The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

84. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

85. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

86. Equifax knew or should have known of Plaintiff Ruth Lindsey's bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Equifax continued to prepare a patently false consumer report concerning Plaintiff.

87. Despite actual and implied knowledge that Plaintiff's credit report was and/or is

not accurate, Equifax readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

88.    After Equifax knew or should have known Plaintiff's bankruptcy status, history, and/or payment history were inaccurate for Plaintiff's Advia and Rocket tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

89.    As a result of Equifax's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit reports; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false

light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

90. Equifax's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiff Ruth Lindsey to recover under 15 U.S.C. § 1681o.

91. The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

## EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

92. The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

93. Equifax violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiff's credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit files, and relying upon verification from a source it has reason to know is unreliable.

94. As a result of Equifax's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and

annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit reports; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit scores may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

95.     Equifax's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff Ruth Lindsey to recover actual damages under 15 U.S.C. § 1681o.

96.     The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681e(b))**

97.     The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

98.     Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

99.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

100.    Experian knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Experian continued to prepare a patently false consumer report concerning Plaintiffs.

101.    Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Experian readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

102.    After Experian knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' Advia and Plaintiff Ruth Lindsey's Rocket tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

103.     As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs' spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

104.     Experian's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In

the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

105.   The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

106.   The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

107.   Experian violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

108.   As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in

Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs' spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

109. Experian's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

110. The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## TRANS UNION'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

111. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

112. Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow

reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

113. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

114. Trans Union knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Trans Union continued to prepare a patently false consumer report concerning Plaintiffs.

115. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Trans Union readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

116. After Trans Union knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' Advia and Plaintiff Ruth Lindsey's Rocket tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

117. As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional

distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs' spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

118. Trans Union's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

119. The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**TRANS UNION'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

120.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

121.    Trans Union violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

122.    As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs' spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters,

sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

123.    Trans Union's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

124.    The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**ADVIA'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681s-2(b))**

125.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

126.    Furnisher Defendant violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiffs' dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

127.    Furnisher Defendant further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Advia Tradeline(s) within Plaintiffs' credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the

Plaintiffs' disputes of the Advia Tradeline(s), failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of inaccurate information to the Advia Tradeline(s) within the consumer reporting agencies reports.

128. As a result of Furnisher Defendant's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit scores may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit

because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

129.     Furnisher Defendant's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

## VI.     VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

130.     Plaintiffs will be able to show, after reasonable discovery, that all actions at issue were taken by employees, agents, servants, or representatives, of any type, for Defendants, the principals, within the line and scope of such individuals' (or entities') express or implied authority, through employment, agency, or representation, which imputes liability to Defendants for all such actions under the doctrine of respondent superior and/or vicarious liability.

## VII.   DAMAGES

131.     Plaintiffs respectfully request that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of the FCRA and/or states' laws, including Michigan.

132.     Plaintiffs respectfully request that this Honorable Court award Plaintiffs' litigation expenses and other costs of litigation and reasonable attorney's fees incurred in this litigation, in accordance with the provisions of the FCRA and/or other laws.

133.     The above and foregoing actions, inactions, and fault of Defendants, as to each and every claim, have proximately caused a wide variety of damages to Plaintiffs.

134.    Defendants performed perfunctory and essentially useless reinvestigations resulting in the verification of false reportings about the Plaintiffs and have been a substantial factor in causing credit denials and other damages.

135.    Plaintiffs suffered a variety of damages, including economic and non-economic damages as prayed for herein.

136.    Defendants have negligently and/or willfully violated various provisions of the FCRA and are thereby liable unto Plaintiffs.

137.    Defendants are liable unto Plaintiffs for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to: out-of-pocket expenses; credit denials; loss in Plaintiffs' ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit scores may have impacted the interest rates Plaintiffs has on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendants to comply with Defendants' statutory obligations, including but not limited to reviewing information online, telephone calls,

emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendants; loss of self-esteem because of Defendants' continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believes Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendants; attorney's fees; court costs; and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PREMESIS CONSIDERED**, Plaintiffs pray that this Honorable Court:

A.     Enter Judgment in favor of Plaintiffs and against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and Advia Credit Union, jointly, severally, and in solido, for all reasonable damages sustained by Plaintiffs, including, but not limited to, actual damages, compensatory damages, out-of-pocket expenses, credit denials, costs and time of repairing Plaintiffs' credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, and fear of personal and financial safety and security for Defendants' violations of the FCRA, applicable state law, and common law;

B.     Find that the appropriate circumstances exist for an award of punitive damages to Plaintiffs;

C.     Award Plaintiffs pre-judgment and post-judgment interest, as allowed by law;

D.     Order that CRA Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC, and Furnisher Defendant, Advia Credit Union,

work in conjunction, cooperatively, and/or individually to reinvestigate and correct the consumer report(s), credit report(s), data emanations, consumer histories, and credit histories of and concerning Plaintiffs and/or any of Plaintiffs' personal identifiers.

  E. Grant such other and further relief, in law or equity, to which Plaintiffs might show Plaintiffs are justly entitled.

Date Filed: <u>March 27, 2026</u>

         Respectfully submitted,

         */s/ Blake R. Bauer*
         Blake R. Bauer
         MN Bar Number 0396262
         FCRA-TX@fieldslaw.com
         FIELDS LAW FIRM
         9999 Wayzata Blvd.
         Minnetonka, Minnesota 55305
         (612) 383-1868 (telephone)
         (612) 370-4256 (fax)

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

March 27, 2026
Date

*/s/ Blake R. Bauer*
Blake R. Bauer